**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SURGE STAFFING, LLC,<br>Plaintiff,<br>v.<br>ASHLEY BOSH, TARA WHITEHEAD, TAMARIA STEVENS, and WISE SERVICES, INC.,<br>Defendants. | Civil Action No.<br>1:25-cv-05047-SDG |

**OPINION AND ORDER**

This matter is before the Court on Defendants Ashley Bosh, Tara Whitehead, Tamaria Stevens, and Wise Services, Inc.'s (Wise) motion to dismiss Plaintiff Surge Staffing, LLC's (Surge) Complaint for failure to state a claim [ECF 45]. After careful consideration, the motion to dismiss is **GRANTED in part** and **DENIED in part**. Also before the Court is Surge's supplemental motion for leave to file matters under seal [ECF 46]. The motion to seal is **GRANTED**.

## I. BACKGROUND

The following facts are accepted as true for purposes of this Order.[1] Surge is a national staffing agency that provides temporary (temp) employees to work on

[1] *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 n.1 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

an hourly basis for its customers.[2] Surge's customers span many industries, including the logistics, technology, call center, manufacturing, administrative, and automotive industries, and many have maintained long-term relationships with the staffing agency.[3] Surge recruits, interviews, hires, and trains applicants to fill its temp workforce, so that it can provide its customers with temp employees specific to their industry needs.[4]

In addition to building its temp workforce, Surge also spends considerable time and resources developing the skillset of its recruitment employees, who attract and hire Surge's temp workforce.[5] Surge provides its recruitment employees with allegedly confidential Surge-specific training resources, such as explanatory documents, online courses, and remote and in-person training sessions; Surge compiles its online training resources in a website called "Surge Inside" that employees must use a virtual private network (VPN), username, password, and two-factor authentication to access.[6] Surge also has a four-step onboarding system called the "Surge Performance Selection System" that all

---

2 ECF 1, ¶¶ 23–24 (filed under provisional seal at ECF 27-1). To the extent that this Order references statements filed under seal, the Court has determined that those statements should not have been sealed.

3 *Id.* ¶ 24.

4 *Id.* ¶¶ 24–26, 29.

5 *Id.* ¶¶ 31–33.

6 *Id.* ¶¶ 33, 48.

employees must complete; Surge purports that its Performance Selection System is proprietary and designed to "best match applicant skills, experience, and career interests to client needs" and "explore candidate career interests and further develop skill sets."[7]

Surge's recruitment employees are trusted with allegedly confidential information related to its customers and business model.[8] Such confidential information includes the names of past, current, and prospective customers; operational techniques of customers; customer preferences; temp employee information; and hourly "mark-up" rates for temp employees (meaning, the percentage mark-up that Surge charges its customers for employing its temp workers, on top of what Surge pays them), among other information.[9] This information is compiled into a database called "Beyond"; Surge employees can add information to Beyond and are required to do so in certain instances, such as when interacting with customers.[10] If accessing this information remotely, Surge employees must log in through a VPN, using a password and two-factor authentication.[11] Surge can restrict employee access within Beyond, such as by

---

7 *Id.* ¶¶ 34–35.

8 *Id.* ¶ 40.

9 *Id.* ¶¶ 40–45.

10 *Id.* ¶ 44.

11 *Id.* ¶ 48.

employees or by region.[12] All Surge employees are required to sign employment agreements that contain non-disclosure provisions.[13]

Ashley Bosh, Tara Whitehead, and Tamaria Stevens (the Individual Defendants) were employees of Surge in Georgia until their respective resignations or terminations in 2025.[14] Bosh worked as a Workforce Development Manager in Surge's Conyers office until her resignation on January 16, 2025.[15] Bosh was responsible for recruiting and placing temp employees and interacting with customers in the Conyers area.[16] Whitehead worked as a Branch Manager and Leader in Surge's Forsyth and Macon offices until her termination on July 17, 2025.[17] Whitehead was responsible for overseeing customer accounts, supervising employees, and generating new business opportunities, all in the Forsyth area.[18] And Stevens worked as a Talent Advisor in Surge's Pooler office until her termination on June 13, 2025.[19] Stevens was responsible for recruiting,

---

12 *Id.* ¶ 49.

13 *Id.*

14 *Id.* ¶¶ 14–16.

15 *Id.* ¶ 14.

16 *Id.* ¶ 59.

17 *Id.* ¶¶ 15, 184.

18 *Id.* ¶ 77.

19 *Id.* ¶ 16.

interviewing, and placing temp employees with customers in the Savannah metropolitan area.[20]

As conditions of their employment, the Individual Defendants all entered into Employment Agreements with Surge, in which they agreed to protect Surge's confidential information; to refrain from competing with Surge or soliciting its customers and employees for a period of two years following separation; and to return all company property upon departure.[21] Further, as part of their non-compete obligation, the Individual Defendants agreed not to work for a competitor within a 50-mile radius of any Surge branch office.[22]

After Bosh, Whitehead, and Stevens terminated their respective employment, they each accepted employment with Wise, a competitor of Surge, in its Georgia operations.[23] In their new positions, the Individual Defendants performed substantially similar roles and functions to the work they did for Surge.[24] Wise encouraged the Individual Defendants to target Surge customers, and advised them not to be concerned with their restrictive covenants with

---

20 *Id.* ¶ 90.

21 *Id.* ¶¶ 60–66, 78-82, 91–95.

22 *Id.* ¶¶ 63, 80, 93.

23 *Id.* ¶¶ 73, 85, 97.

24 *Id.*

Surge.[25] Surge subsequently issued a cease-and-desist letter to each Individual Defendant, but they continued to remain employed by Wise in Georgia and to solicit Surge customers.[26]

On September 5, 2025, Surge filed its Complaint.[27] The Complaint asserts seven counts (each against all Defendants unless specified otherwise): (I) breach of contract;[28] (II) violations of the federal Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*);[29] (III) violations of the Georgia Trade Secrets Act (O.C.G.A. § 10-1-760, *et seq.*);[30] (IV) unjust enrichment;[31] (V) tortious interference with contract against Wise only;[32] (VI) tortious interference with prospective economic

---

25 *Id.* ¶ 113.

26 *Id.* ¶¶ 69, 86, 99.

27 *Id.* ¶¶ 69, 86, 99. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Complete diversity is met: Surge is a citizen of Ohio, *see* ECF 57, at 3; Wise is a citizen of Mississippi, *see* ECF 58, at 3; ECF 1, ¶ 19; and the Individual Defendants are all citizens of Georgia, *see* ECF 58, at 3. And the amount in controversy exceeds $75,000. ECF 1, ¶ 17. The Court has also subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Surge asserts claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

28 ECF 1, ¶¶ 135–152.

29 *Id.* ¶¶ 153–163.

30 *Id.* ¶¶ 164–176.

31 *Id.* ¶¶ 177–189.

32 *Id.* ¶¶ 190–200.

advantage against Wise only;[33] and (VII) civil conspiracy.[34] Defendants move to dismiss all counts for failure to state a claim.[35]

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). A complaint fails to state a claim when it does not "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555–56 (citations omitted).

---

33 *Id.* ¶¶ 201–211.

34 *Id.* ¶¶ 212–219.

35 ECF 45.

A complaint is plausible on its face when a plaintiff pleads sufficient factual content for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Am. Dental Ass'n*, 605 F.3d at 1289 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A complaint must also present sufficient facts to "'raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Twombly*, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)). This principle, however, does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

As mentioned, Surge asserts seven counts: breach of contract; violations of the federal Defend Trade Secrets Act (DTSA); violations of the Georgia Trade Secrets Act (GTSA); unjust enrichment; tortious interference with contract; tortious interference with prospective economic advantage; and civil conspiracy. Because resolution of the motion to dismiss the unjust enrichment and

tortious interference claims depends on the Court's treatment of the breach of contract claims, the Court will address the counts out of order. The Court will consider the trade secret claims first before turning to the breach of contract and remaining claims.

**A. Trade Secrets Claims**

In Counts II and III, Surge asserts claims for misappropriation of trade secrets against all Defendants under the DTSA and the GTSA. Under the GTSA, a claim for misappropriation of trade secrets requires a plaintiff to prove that "(1) it had a trade secret and (2) the opposing party misappropriated the trade secret." *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290–91 (11th Cir. 2003) (citations omitted). "DTSA requires the same showing, but with the additional requirement that the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Angel Oak Mortg. Sols. LLC v. Mastronardi*, 593 F. Supp. 3d 1234, 1244 (N.D. Ga. 2022) (citations omitted). Both statutes define misappropriation as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(A)–(B); O.C.G.A. § 10-1-761(2)(A)–(B).

Many of Surge's allegations supporting these claims are conclusory and speculative. Surge alleges "upon information and belief" that the Individual Defendants have "misappropriated, disclosed, inevitably will disclose, or are threatening to disclose Surge's trade secrets for the benefits of Wise."[36] It emphasizes that each Individual Defendant "joined or affiliated with Wise in substantially similar roles, thereby placing them in a position to exploit Surge's trade secrets to Surge's detriment and Wise's benefit."[37] Allegations like these are insufficient. To state a plausible claim for relief, Surge must do more than show that there is "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (emphasis added). The fact that the Individual Defendants had access to Surge's confidential information and later took functionally similar jobs at Wise does not, standing alone, mean that they misappropriated Surge's trade secrets.

For a trade secret misappropriation claim, a plaintiff must plausibly allege improper acquisition or disclosure, not merely that the defendant was in a "position to exploit" she former employer's trade secrets. And it is well-established that acquiring information through the course of one's employment is not "improper." *See Putters v. Rmax Operating, LLC*, 2014 WL 1466902, at *3 (N.D. Ga. Apr. 15, 2014) (noting that trade secret information initially acquired

36 ECF 1, ¶ 157.

37 *Id.*

during employment is not acquired by improper means); *Onbrand Media v. Codex Consulting, Inc.*, 301 Ga. App. 141, 149 (2009) ("Even assuming that the Defendants did have knowledge of the Plaintiffs' trade secrets, there is no evidence that any such information was obtained in any way other than by voluntary disclosure by the Plaintiffs.").

Where Surge offers nothing more than conclusory and speculative allegations, its claims against particular defendants cannot proceed. This is the case for its claims against Whitehead and Stevens. As to Whitehead, Surge states that, "[i]n the weeks leading up to her departure," she "engaged in suspicious activity consistent with misappropriation of confidential information."[38] "Suspicious activity" is not the sort of conduct on which a trade secret misappropriation claim can proceed. The only non-conclusory and non-speculative allegation that Surge makes as to Whitehead is that, prior her to departure, she "forward[ed] to her personal email account a Surge email containing details on Surge's temp staff, in direct violation of Surge policy."[39] But Surges fails to allege that these "details" constitute trade secrets. As Surge is required to allege that Whitehead misappropriated a ***trade secret***, not just

38 *Id.* ¶ 84.

39 *Id.*

confidential information, its misappropriation claim against Whitehead fails to state a claim.

Surge's allegations against Stevens are even weaker. In a nutshell, Surge alleges that Stevens had access to Surge's "proprietary" information and, after being fired by Surge, took a job at Wise that was similar to her previous role with Surge.[40] According to Surge, these actions constitute "inevitable misappropriation of Surge's trade secrets."[41] That's a nonstarter: both the GTSA and DTSA—and, not to mention, Article III of the United States Constitution—require ***actual*** misappropriation. 18 U.S.C. § 1839(5)(A)–(B); O.C.G.A. § 10-1-761(2)(A)–(B); *see generally Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–11 (2013) (holding that a threatened future injury must be "certainly impending" to demonstrate an injury in fact for purposes of Article III standing). Speculation about "inevitable" misappropriation will not do. Nor does Surge even allege that the purportedly "proprietary" information is actually a trade secret. Surge's trade secret misappropriation claim against Stevens cannot proceed either.

Surge's misappropriation claims against Bosh and Wise, on the other hand, are plausible. Surge alleges that Bosh forwarded "dozens of internal documents"

---

40 *Id.* ¶¶ 96–99.

41 *Id.* ¶ 100.

from her Surge email account to her personal email address, in violation of Surge's employee policy.[42] These emails included information such as:

> [D]etailed customer contact lists, including names, phone numbers, and email addresses of decision-makers at Surge's active accounts; pricing sheets reflecting Surge's agreed mark-ups with particular customers; rosters of temporary employees assigned to customer locations, including job titles, pay rates, and bill rates; internal training materials prepared at significant expense by Surge; and prospect lists identifying potential new accounts under development by Surge.[43]

Here, Surge has sufficiently alleged that at least some of the information allegedly misappropriated constitutes trade secrets. Information qualifies as a trade secret if "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person." 18 U.S.C. § 1839(3); *see* O.C.G.A. § 10-1-761(4).

Trade secrets need not be disclosed in detail at the pleading stage. *See Earthcam, Inc. v. Oxblue Corp.*, 2012 WL 12836518, at *9 (N.D. Ga. Mar. 26, 2012). And "whether something is a trade secret is a question typically resolved by a fact finder after full presentation of evidence from each side." *Yellowfin Yachts, Inc. v.*

---

42 *Id.* ¶ 68.

43 *Id.* ¶ 70 (cleaned up).

*Barker Boatworks, LLC*, 898 F.3d 1279, 1298 (11th Cir. 2018). As such, it is sufficient that Surge has alleged that it keeps this information "closely safeguarded" using "cyber-security measures and password protection," among other measures, and that this information has been developed over the course of many years and provides Surge with a "competitive advantage" in the staffing industry.[44]

Surge has also sufficiently alleged that Bosh misappropriated this information. It is plausible that Bosh acquired this information by "improper means," as Surges alleges that forwarding internal documents from a company email to a personal email was "in direct violation of Surge's employee policy."[45] It is also plausible that Bosh used or disclosed this information without consent, as Surge alleges it experienced "a sudden and marked decline in customer activity" for accounts that Bosh managed and to which the trade secret information related.[46] From this, it is reasonable to infer that Bosh used Surge's trade secret information to solicit her former Surge clients after she started working for Wise. And because Bosh was employed by Wise when she allegedly used Surge's misappropriated trade secrets, her conduct can be attributed to Wise.

---

44 *Id.* ¶¶ 45–49.

45 *Id.* ¶ 68.

46 *Id.* ¶ 64.

Accordingly, Surge's GTSA and DTSA claims against Bosh and Wise survive dismissal at this stage,[47] but its GTSA and DTSA claims against Whitehead and Stevens do not.

**B. Breach of Contract**

In Count I, Surge claims that the Individual Defendants violated their respective Employment Agreements with Surge when they began working for Wise. The Individual Defendants move to dismiss on the ground that the agreements' restrictive covenants are unenforceable. The Employment Agreements contain identical non-competition covenants:

> [Y]ou agree that during your employment and for a period of two (2) years from the date of termination or separation . . . you will not, either directly or indirectly, on your own account or as an agent . . . employee or otherwise, compete with Surge or be employed by a Company in Competition with Surge, within a radius of 50 miles of any city where Surge has an office or provides services, at the time of such termination or separation. For purposes of this Agreement, a Company in Competition with Surge includes, but is not limited to, any staffing or temp agency that contracts with a third party to provide one or more of the following types of work or services: 1) light industrial, 2) finance, 3) accounting, 4) engineering, 5) clerical,

47 The last element of a DTSA claim—that "the misappropriated trade secret is related to a product or a service used in, or intended for use in, interstate or foreign commerce"—is satisfied. *Angel Oak*, 593 F. Supp. 3d at 1244; 18 U.S.C. § 1836(b)(1). Surge alleges that its "trade secrets are used in and affect interstate commerce," because it "provides staffing services and maintains client relationships across multiple states," ECF 1, ¶ 160, and Defendants do not contend otherwise.

> 6) administrative, 7) information technology, and/or 8) food manufacturing. A Company in Competition with Surge also includes, but is not limited to, 1) any company that recruits candidates and/or employees for a third party for a profit and/or 2) a company that performs Managed Services. Managed Services include, but are not limited to, managing the procurement of staffing-related services for a third-party client.[48]

The Employment Agreements also contain identical non-solicitation covenants:

> For the purposes of this Agreement, Customer means any current customer of Surge as well as any person, company or business entity that succeeds such a customer by carrying on substantially the same business of a customer in the same location. . . . You also agree . . . not to solicit any Customer on behalf of a Company in Competition, and not to provide services to any Customer except through Surge for this two (2) year period.[49]

And with respect to confidential information, the Employment Agreements contain identical non-disclosure covenants which provide:

> [Y]ou hereby agree that . . . you will safeguard such [special] training and information, and you will not disclose or use such training or confidential information except as may be required to perform your job duties for Surge. Confidential information referred to throughout this Agreement shall include any and all confidential and/or proprietary knowledge, data, or information of Surge. By way of illustration but not limitation, confidential information includes tangible and intangible information that is not generally known to the public including or relating to formulations, products,

48 ECFs 1-4, 1-9, and 1-13, ¶ 10.

49 ECFs 1-4, 1-9, and 1-13, ¶ 12.

> services, processes, know-how, designs, trade secrets, formulas, methods, communications, agreements with third parties, markups, developmental or experimental work, data, drawings, worksheets, blueprints, concepts, samples, inventions, improvements, discoveries, research, marketing plans, promotions, business plans, strategies, techniques, budgets, unpublished financial statements, financial forecasts, licenses, prices, pricing methodology, costs, suppliers, customers, prospects, acquisitions, contacts, trainings or training material, audits, personnel, and/or information which would be deemed by a reasonable person to be confidential.[50]

**1. Choice of Law**

As a preliminary matter, the Court must address which state's laws apply to the enforceability of the restrictive covenants. The Employment Agreements all contain an Ohio choice-of-law provision,[51] but the parties rely on Georgia law in their briefing. In a footnote, the Individual Defendants argue that Georgia law controls because enforcement under Ohio law would contravene Georgia public policy.[52] As a federal court sitting in diversity, this Court must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules. *Whitaker v. Harvell-Kilgore Corp.*, 418 F.2d 1010, 1015 (5th Cir. 1969).[53]

---

50 ECFs 1-4, 1-9, and 1-13, ¶ 8.

51 *See* ECFs 1-4, 1-9, and 1-13, ¶ 20.

52 ECF 45, at 14 n.1.

53 Fifth Circuit cases decided before October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

The Supreme Court of Georgia has held that "a Georgia court that is asked to apply foreign [*i.e.*, out of state] law to determine whether to enforce a restrictive covenant must first apply the [the Georgia Restricted Covenants Act (GRCA)] to determine whether the restrictive covenant complies with it." *Motorsports of Conyers, LLC v. Burbach*, 317 Ga. 206, 216 (2023). "This includes an analysis of whether the restrictions at issue are 'reasonable in time, geographic area, and scope.'" *Id.* (quoting O.C.G.A. § 13-8-53(a)). Under *Motorsports*, courts may need to assess whether a restrictive covenant is reasonable under two states' laws: If a court concludes that the restrictive covenant is reasonable under the GRCA, the court "can honor the choice-of-law provision and apply the foreign law to determine the enforceability of the restrictive covenant," but if the restrictive covenant is unreasonable under the GRCA, the court "may not apply foreign law to enforce it." *Id.*

**2. The Non-Competition Covenants**

Here, the durational restriction is reasonable: The GRCA instructs courts to presume that any durational restraint of two years or less is reasonable, and the restrictive covenants at issue provide for a two-year duration. O.C.G.A. § 13-8-57(b). However, this is the only restriction in Surge's non-competition covenant that is clearly reasonable.

First, the Court concludes that the 50-mile geographical radius from "any city where Surge has an office or provides services" is too broad a restriction. Section 13-8-56(2) provides that a geographical restriction on competition, which includes the areas in which the employer does business at any time during the parties' relationship, is reasonable provided that: (1) the total distance encompassed by the provisions of the covenant is reasonable or (2) the agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship. *See also Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1305 (11th Cir. 2023) (discussing O.C.G.A. § 13-8-56(2)). The Employment Agreements do not contain a list of particular competitors as prohibited employers, nor do they identify Wise in particular, so that is out.

To determine whether the "total distance" of the geographical area of a restrictive covenant is reasonable, the Court must consider the territorial restriction "in light of the business interest it protects." *Baldwin*, 87 F.4th at 1305. In *Baldwin*, the Eleventh Circuit considered unreasonable a geographic restriction prohibiting competition within a five-mile radius of any automative services location operated by the plaintiff or its affiliates. *Id.* at 1303–05. There, the five-mile radius applied to over 1,110 franchise locations across 29 states—despite the fact that the defendant only oversaw 18 locations during his employment. *Id.* at 1304.

The court concluded that the massive scope of this restriction did not support the plaintiff's legitimate business interest in preventing the defendant from luring away technicians and customers. *Id.* at 1304–05.

The geographic limitation in the Employment Agreements here is similarly expansive and imposes a 10-fold larger radius than the one in *Baldwin*: it prohibits the Individual Defendants from competing with Surge "within a radius of 50 miles of any city where Surge has an office or provides services."[54] Surge has 173 offices in 23 states,[55] but the Individual Defendants worked only in specific offices, and all in only Georgia—Bosh in Conyers, Stevens in Savannah, and Whitehead in Forsyth and Macon.[56]

Surge asserts that the restrictive covenants support its legitimate business interests in protecting its "trade secrets, customer relationships, and goodwill."[57] Much like *Baldwin*, here there is a "mismatch" between Surge's expressed business interests and the scope of the geographic restrictions it seeks to impose on the Individual Defendants. 87 F.4th at 1304. For starters, the Court does not see how a geographic restriction in a non-compete provision is necessary to protect a

---

[54] ECFs 1-4, 1-9, and 1-13, ¶ 10.

[55] ECF 1-16.

[56] ECF 1, ¶¶ 59, 90, 184.

[57] *Id.* ¶ 142.

company's trade secrets—theoretically, the disclosure of trade secrets would harm Surge no matter where they were disclosed, be it five miles away from one of its offices or 500. Rather, that interest seems better served by the non-disclosure provision. As such, the only legitimate interests in enforcing the non-competition covenants in particular are Surge's "customer relationships" and its "goodwill." To that end, as in *Baldwin*, the Court considers it unlikely that Surge may appropriately restrict the Individual Defendants from "poaching" customers in areas where they had "no apparent relationships with [Surge's] . . . customers." *Id.* Accordingly, the geographic restriction is unreasonable.

Lastly, as it concerns the scope of prohibited activities, the non-competition covenant is hopelessly overbroad. The Employment Agreements prohibit the Individual Defendants from "directly or indirectly" "compet[ing] with Surge" or "be[ing] employed by a Company in Competition with Surge."[58] The Agreements define a "Company" in "Competition with Surge" as (1) "any staffing or temp agency that contracts with a third party to provide" light industrial, financial, accounting, engineering, clerical, administrative, information technology, or food manufacturing services, (2) "any company that recruits candidates [ ] or employees for a third party for a profit," or (3) "a company that performs Managed

58 ECFs 1-4, 1-9, and 1-13, ¶ 10.

Services," which it defines as "managing the procurement of staffing-related services for a third-party client."[59]

As a practical matter, the gigantic scope of the non-competition clause here bars the Individual Defendants from working for or assisting ***any*** staffing, temp, or recruiting agency in any capacity.[60] Under Georgia law, this is a no-no: "non-compete clauses that 'do not list specific limits on the type of activity, and effectively bar former employees from working in any capacity for competitors' are unreasonable and overbroad." *All States AG Parts, LLC v. Herzig*, 374 Ga. App. 389, 395 (2025) (quoting *Burbach v. Motorsports of Conyers*, 363 Ga. App. 188, 191–92 (2022), *vacated and remanded on other grounds by Motorsports*, 317 Ga. at 217–18).

Surge attempts to distinguish its non-competition clause from the one declared unreasonable in *All States* by emphasizing that the *All States* non-competition clause specifically included the phrase "in any capacity."[61] But in practical effect, Surge's non-competition clause is no different. As the Court sees it, there is no limiting language in the Employee Agreements. And contrary to Surge's assertions, this case is readily distinguishable from *Heartland Payment*

---

59 ECFs 1-4, 1-9, and 1-13, ¶ 10.

60 *E.g.*, ECFs 1-4, 1-9, and 1-13, ¶ 10 ("[Y]ou agree that . . . you will not . . . be employed by a Company in Competition with Surge . . . .").

61 ECF 53, at 14.

*Systems, LLC v. Stockwell*, 446 F. Supp. 3d 1275, 1284 (N.D. Ga. 2020), in which undersigned found reasonable a non-competition covenant that limited former employees of a payment-processing technology services provider from working for competitors that provide the same services. The covenant in *Heartland Payment Systems* concerned competitors that provided the same niche products or services, whereas Surge's non-competition clause attempts to effectively prohibit the Individual Defendants from working in any capacity in the entire staffing and recruiting industry.

Because the scope of prohibited activities is unreasonable, the non-competition clause, as written, is unenforceable. Further, the Court sees no way to "blue-pencil" the clause and render it reasonable. Under § 13-8-53(d), courts are permitted to "modify a covenant that is otherwise void and unenforceable," a practice referred to by Georgia courts as blue-penciling. *See generally Zammit v. Hobson & Hobson, P.C.*, 372 Ga. App. 174, 177 (2024) (describing blue-penciling). Whether to blue-pencil an unreasonable and unenforceable restrictive covenant is within the court's discretion. *See Belt Power, LLC v. Reed*, 354 Ga. App. 289, 295 (2020); O.C.G.A. § § 13-8-53(d) (stating that a court "may" modify an otherwise void and unenforceable restrictive covenant). The far-reaching scope of prohibited activities suggests that Surge's intent in drafting the non-competition covenants was to prohibit the Individual Defendants from working for any company in the

staffing and recruiting industries. It is against Georgia public policy to impose a "general restraint of trade," *Motorsports*, 317 Ga. at 211, so the Court sees no way to modify this restriction to "comport with the reasonable intent and expectations of the parties to the covenant[s]." O.C.G.A. § 13-8-54(a).

And, because the non-competition covenant is unreasonable under the GRCA, the Court need not determine whether it would be considered reasonable under Ohio law. Enforcing the non-competition covenants against the Individual Defendants would violate Georgia public policy. *Motorsports*, 317 Ga. at 216 (holding that courts may not apply foreign law to enforce unreasonable restrictive covenants).

**3. The Non-Solicitation Covenants**

Under the GRCA, customer non-solicitation covenants are enforceable if they are reasonable, and "[n]o express reference to geographic area or the types of products or services considered to be competitive shall be required in order for the restraint to be enforceable." O.C.G.A. § 13-8-53(b). The statute provides that:

> [a]ny reference to a prohibition against 'soliciting or attempting to solicit business from customers' or similar language shall be adequate for such purpose and narrowly construed to apply only to:
>
> (1) such of the employer's customers, including actively sought prospective customers, with whom the employee had material contact; and

> (2) products or services that are competitive with those provided by the employer's business.

O.C.G.A. § 13-8-53(b).

The Individual Defendants argue that the non-solicitation covenants are unenforceable because they are overbroad; specifically, they take issue with the covenant's language barring them from soliciting or provided undefined "services" to any "current customer of Surge."[62] Here, the Court disagrees. As mentioned, the GRCA does not require a non-solicitation covenant to contain an "express reference to . . . the types of products or services considered to be competitive," nor does it require the covenant to identify specific customers. O.C.G.A. § 13-8-53(b). The plain language of § 13-8-53(b) "permits the drafting of broad non-solicitation provisions that will be subsequently limited pursuant to the parameters set forth in O.C.G.A. § 13-8-53(b)." *Tanium Inc. v. Yago*, 2021 WL 5033452, at *15 (N.D. Ga. July 28, 2021) (citations and quotation marks omitted).

Because the non-solicitation provisions are reasonable under the GRCA, the Court considers whether they are reasonable under Ohio law. *See Motorsports*, 317 Ga. at 216. Under Ohio law, non-solicitation covenants are not treated differently from non-competition covenants. *See generally James B. Oswald Co. v. Neate*, 98 F.4th 666, 670–73 (6th Cir. 2024) (assessing a non-solicitation covenant by the same test

---

62 ECF 45, at 18.

as used for other restrictive covenants). And in Ohio, "only reasonable noncompetition agreements are enforceable." *Lake Land Emp't Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 33 (Ohio 2004) (discussing *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975)). A restrictive covenant is considered reasonable under Ohio law if it satisfies three broad factors. The covenant must: (1) be "no greater than is required for the protection of the employer"; (2) "not impose undue hardship on the employee"; and (3) not be "injurious to the public." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (quoting *Raimonde*, 325 N.E.2d at 547). And in assessing each factor, there are "nine fact-specific considerations to 'keep in mind.'" *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022) (quoting *Rogers v. Runfola & Assocs.*, 565 N.E.2d 540, 543–44 (Ohio 1991)). However, because this is a fact-specific test, Ohio courts are hesitant to determine the enforceability of restrictive covenants "until the parties have had sufficient opportunity to develop a factual record." *Ecolab, Inc. v. Glanz*, 2023 WL 2655652, at *4 (S.D. Ohio Mar. 27, 2023). As such, the Court cannot, at this stage, determine if the non-solicitation covenant is reasonable under Ohio law.

**4. The Non-Disclosure Covenants**

Under the GRCA, customer non-disclosure covenants are enforceable if they are reasonable, and the restriction need not be limited in duration or geographic area. O.C.G.A. § 13-8-53(a), (e). In the context of restrictive covenants that govern

the non-disclosure of confidential information, the reasonableness of the restrictive covenants hinges on two main factors: "(1) whether the employer is attempting to protect confidential information relating to the business, such as trade secrets, methods of operation, names of customers, personnel data, and so on; and (2) whether the restraint is reasonably related to the protection of the information." *Brown v. Yazdi*, 2025 WL 3125023, at *7 (N.D. Ga. Aug. 6, 2025) (quoting *Holland Ins. Grp., LLC v. Senior Life Ins. Co.*, 329 Ga. App. 834, 838 (2014)). The GRCA defines "confidential information" as data and information "[r]elating to the business of the employer"; that is "[d]isclosed to the employee or of which the employee became aware of as a consequence of the employee's relationship with the employer"; that has "value to the employer"; that is "[n]ot generally known to competitors of the employer"; and which may include certain categories of information such as "trade secrets, methods of operation, names of customers, price lists, financial information and projections, route books, personnel data, and similar information." O.C.G.A. § 13-8-51(3).

The Individual Defendants argue that the non-disclosure covenants are unenforceable because they make "no distinction between non-business-related information" and business-related information.[63] The Court disagrees. The

63 *Id.* at 20.

Employment Agreements define confidential information as "any and all confidential [ ] or proprietary knowledge, data, or information of Surge"; the Agreements further define the term with a non-exhaustive list of examples, which all appear business-related, including "products, services, processes," "trade secrets," "marketing plans, promotions, business plans," "pricing methodology," and other similar things.[64] These items are sufficiently business-related, and the non-disclosure covenant is therefore not unreasonable under the GRCA.

Here too, the Court reserves ruling on whether the non-disclosure covenants are unreasonable under Ohio law. *See, e.g.*, *LeafFilter N., LLC v. Marshall*, 2026 WL 98479, at *4–*6 (N.D. Ohio Jan. 14, 2026) (assessing the reasonableness of a non-disclosure covenant under the same multi-factor test for restrictive covenants as *Raimonde*). Because the state's multi-factor test for determining the enforceability of restrictive covenants is fact-specific and aided by "the benefit of discovery," *Ecolab*, 2023 WL 2655652, at *4, the Court cannot make a pleadings-based determination as the motion to dismiss requests.

* * * *

In sum, the Individual Defendants' motion to dismiss, as it relates to the breach-of-contract claims in Count I, is granted in part and denied in part. It is granted as to the non-competition clause because it is unreasonable under the

64 ECFs 1-4, 1-9, and 1-13, ¶ 8.

GRCA and therefore cannot be enforced. But it is denied as to the non-solicitation and non-disclosure clauses because those restrictive covenants are reasonable under Georgia law and the Court cannot yet determine whether they are reasonable under Ohio law.

### C. Tortious Interference Claims

In Counts V and VI, Surge asserts tortious interference claims against Wise only—first for tortious interference with contract, and second for tortious interference with prospective business relations.[65] Whether it be for contractual relations or prospective business relations, tortious interference claims generally have the same elements, differing only on the third requirement. To state a claim for tortious interference, a plaintiff must allege (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff. *Duke Galish, LLC v. Manton*, 291 Ga. App. 827, 832 (2008). Improper conduct, as used in

---

[65] Surge refers to this claim as tortious interference with prospective "economic advantage," but Georgia courts generally use the synonymous term of "business relations." *See, e.g.*, *Duke Galish, LLC v. Manton*, 291 Ga. App. 827, 832 (2008). The Court will use the latter.

the first element of a tortious interference claim, generally means "predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *BB&T Ins. Servs., Inc. v. Renno*, 361 Ga. App. 415, 428 (2021). It is not enough to show that a defendant "simply persuaded a person to break a contract." *Id.*

As Wise points out, Surge makes two claims within each tortious interference count: first, Surge alleges that, through the actions of the Individual Defendants, Wise induced the diversion of Surge customers and temp employees, and second, Surge alleges that Wise induced the Individual Defendants to breach their Employment Agreements. Wise does not address the first theory; its only argument in moving to dismiss the tortious interference claims is that the restrictive covenants in the Employment Agreements are unenforceable, and that, absent a valid restrictive covenant, its conduct was not improper.

As detailed above, the non-competition provisions are the only restrictive covenants in the Employment Agreements that the Court finds void and unenforceable under the GRCA. Accordingly, Surge's tortious interference claims cannot proceed on the theory that Wise caused the Individual Defendants to break the non-competition provisions of their Agreements. *See Acousti Eng'g of Fla. v. Jernigan*, 2024 WL 4535279, at *9 (N.D. Ga. Aug. 27, 2024) (concluding there was no

improper conduct where the defendant poached the competitor-plaintiff's employee). However, Surge's tortious interference claims can proceed insofar as they concern the non-solicitation and non-disclosure provisions, as tortious interference claims may be premised on a defendant causing a plaintiff's former employees to break valid restrictive covenants. *See USI Ins. Servs. LLC v. Se. Series of Lockton Cos., LLC*, 2022 WL 1715211, at *14 (N.D. Ga. Mar. 29, 2022) ("[T]he determination of whether there is improper conduct must be made in the context of enforceable restrictive covenants.").

**D. Unjust Enrichment**

In Count IV, Surge asserts unjust enrichment claims against all Defendants, pled in the alternative. Defendants move to dismiss on the grounds that it is pled in the alternative to Surge's GTSA claims and that the GTSA preempts it. *See* O.C.G.A. § 10-1-767(a) (stating that the GTSA "shall supersede conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret"). In response, Surge contends that its unjust enrichment claims are pled in the alternative to its breach-of-contract claims relating to the non-disclosure provisions.

The GTSA generally preempts claims alleging misuse and retention of confidential information, even if the information in question does not qualify as a trade secret under the statute. *See Robbins v. Supermarket Equip. Sales, LLC*, 290 Ga.

462, 465–66 (2012) ("For the GTSA to maintain its exclusiveness, a plaintiff cannot be allowed to plead a lesser and alternate theory of restitution simply because the information does not qualify as a trade secret under the act."). However, the GTSA contains an important statutory exception; it does not preempt claims based on "[c]ontractual duties or remedies, whether or not based upon misappropriation of a trade secret." O.C.G.A. § 10-1-767(b)(1). *See also Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1345 (N.D. Ga. 2007) ("[I]f a claim seeks to remedy an injury caused not by the misappropriation of proprietary information, but by separate conduct—such as the misappropriation of physical property or the improper interference with contractual relationships respecting something other than proprietary information—such a claim cannot be said to be 'in conflict' with the GTSA.").

Because the Employment Agreements contain non-disclosure provisions, the GTSA does not preempt Surge's unjust enrichment claims against the Individual Defendants. However, since there is no contractual agreement between Surge and Wise, Surge's unjust enrichment claim against Wise is preempted by the GTSA. Defendants' motion to dismiss is therefore granted as to Wise but denied as to the Individual Defendants.

**E. Civil Conspiracy**

In Count VII, Surge asserts a claim for civil conspiracy against all Defendants. "To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort." *Elliott v. Savannah Int'l Motors, Inc.*, 360 Ga. App. 281, 285 (2021) (citations omitted). Absent the underlying tort, there can be no liability for civil conspiracy. *Id.* Defendants move to dismiss this claim in one sentence, arguing that it must be dismissed because the rest of the claims must be dismissed. Because the Court has determined that at least some of Surge's claims may proceed, the civil conspiracy claim proceeds as well. Accordingly, the motion to dismiss is denied as to the civil conspiracy claim.

**F. Request for Injunctive Relief**

Lastly, Defendants move to dismiss Surge's request for injunctive relief, arguing that Surge has not sufficiently alleged irreparable injury and that its request for injunctive relief is an impermissible "obey the law" injunction. The Court declines to do so. For starters, this action is only at the pleading stage, and "[c]ourts are generally reticent to dismiss requests for injunctive relief at the pleading stage and have held that [a] claim for permanent injunction should not

be stricken at the pleading stage when the underlying claim is not dismissed."[66] *Signify N. Am. Corp. v. Robe Lighting Inc.*, 2021 WL 3419187, at *3 (S.D. Fla. Mar. 16, 2021) (citations and quotation marks omitted) (collecting cases). Additionally, Defendants ignore that requests for permanent injunctive relief are routinely granted on claims alleging breach of a restrictive covenant, like Surge alleges. *See, e.g.*, *Heartland Payment Sys.*, 446 F. Supp. 3d at 1283–87; *Cap. Inventory, Inc. v. Green*, 2020 WL 10056790, at *3–*12 (N.D. Ga. Sept. 16, 2020). Surge has sufficiently alleged that the unauthorized disclosure of its trade secrets and confidential information and the solicitation of its customers, both in violation of restrictive covenants contained in the Employment Agreements, will cause it irreparable injury. As such, the Court declines to dismiss Surge's request for injunctive relief at this stage.

## IV. THE MOTION TO SEAL

Also before the Court is Surge's supplemental motion to file documents under seal [ECF 46]. The Court previously denied without prejudice Surge's first motion to seal because the request was facially overbroad.[67] Surge thereafter filed

---

[66] Indeed, in arguing that Surge's request is for an impermissible "obey the law" injunction, Defendant rely on *FieldTurf USA, Inc. v. Polyloom Corp. of America*, which was decided on a motion for preliminary injunction—not on a motion to dismiss. 2024 WL 4868292, at *1 (N.D. Ga. July 31, 2024).

[67] ECF 43.

the supplemental motion, limiting the extent of what it seeks to seal in its supporting exhibits. Having considered the motion and reviewed the proposed redactions, and for good cause shown, the Court grants Surge's motion.

However, in filing its supplemental motion and the accompanying Notice of Filing Revised Redacted Exhibits [ECF 47], Surge only included those Exhibits that were originally overbroad in their redactions and that it has now modified. As such, there is not a singular entry where all properly redacted exhibits are maintained. For ease of reference as this litigation proceeds, Surge is **INSTRUCTED** to refile the Complaint and all exhibits,[68] in both their unredacted and properly redacted forms, within 14 days of this Order. Surge is further **INSTRUCTED** to file under a notice of filing (not as a motion) its previous TRO motion and accompanying exhibits in their unredacted and properly redacted forms.

## V. CONCLUSION

Defendants' motion to dismiss Surge's Complaint [ECF 45] is **GRANTED in part** and **DENIED in part**. It is **GRANTED** as to the following claims, and they are therefore **DISMISSED without prejudice**:

- The claims for misappropriation of trade secrets under the GTSA and DTSA, brought against Defendants Whitehead and Stevens;

---

68 *See* ECFs 27 and 47.

- The breach-of-contract claims against the Individual Defendants based on the non-competition covenants of the Employment Agreements;
- The tortious interference claims against Wise based on the non-competition covenants of the Employment Agreements; and
- The unjust enrichment claim against Wise.

The motion to dismiss is **DENIED** as to the remaining claims. Additionally, the motion to seal [ECF 46] is **GRANTED**, and Surge is **ORDERED**, within 14 days of this Order, to comply with the instructions as to sealing contained in this Order.

Defendants shall file their Answer to the surviving portions of the Complaint within 14 days of this Order. The parties' Joint Preliminary Report and Discovery Plan must be filed within 30 days of Defendants' Answer.

The Clerk is **DIRECTED** to submit this Order to undersigned after 60 days.

**SO ORDERED** this 30th day of September, 2026.

Steven D. Grimberg
United States District Judge